UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

BRIAN MATT,

                Plaintiff,

      v.                                            Case No. 21-C-439

CITY OF GREEN BAY and
TIMOTHY FUERST,

                Defendants.

---

## DECISION AND ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Brian Matt brought this 42 U.S.C. § 1983 action against Defendants the City of Green Bay and one of its officers, Timothy Fuerst, asserting that Officer Fuerst violated his constitutional rights by using excessive force against him after his arrest on January 5, 2021. This matter comes before the Court on Defendants' motion for summary judgment. For the reasons that follow, the motion will be granted.

## BACKGROUND

On the morning of January 5, 2021, Matt was released from Waupun Correctional Institution (WCI). Defs.' Proposed Findings of Fact (DPFOF) ¶ 7, Dkt. No. 20. Matt's sister was originally going to pick Matt up from WCI, but Matt's family stopped taking his phone calls in the days leading up to his release. Pl.'s Proposed Finding of Fact (PPFOF) ¶ 2, Dkt. No. 24. As a result, Matt's friend's sister, whose name Matt does not know, picked him up. DPFOF ¶ 8. While riding with the driver, Matt consumed the Hennessey liquor that was in the driver's vehicle. *Id.* ¶¶ 13–14. After they drove to the U.S. Bank in Fond du Lac, Wisconsin, so Matt could cash his

release check in the amount of at least $3,000.00, they went to a gas station and Matt bought a bottle of vodka and cranberry juice. *Id.* ¶¶ 9–11, 12, 15. On the drive to Green Bay, Matt consumed vodka mixed with cranberry juice. *Id.* ¶ 17. Matt and the driver went to a grocery store in Green Bay, and Matt purchased a bottle of Grey Goose Vodka. *Id.* ¶¶ 18–19. They waited at the grocery store for a taxi to take Matt to his sister's house. *Id.* ¶¶ 20, 24. Matt left the bottles of alcohol he purchased in the driver's vehicle when the taxi arrived, and he does not recall how much of each bottle he drank. *Id.* ¶¶ 22–23.

By the time Matt arrived at his sister's house, he was "very drunk." *Id.* ¶ 25. Matt's sister, mother, stepfather, and daughter were present at the house when he arrived. *Id.* ¶ 26; PPFOF ¶ 10. During a conversation with his sister, mother, and stepfather, his family members perceived Matt to be drunk. DPFOF ¶ 28. Matt's mother did not want Matt's daughter to see him intoxicated, so she asked Matt to go to a hotel to sleep and sober up before returning to the residence. *Id.* ¶ 29; PPFOF ¶ 10. Matt's stepfather drove him to a Motel 6, which was approximately a five-minute drive away from his sister's house. *Id.* ¶¶ 30–31. During the drive to the Motel 6, Matt and his stepfather discussed why Matt's family members stopped answering his phone calls prior to his release from WCI. *Id.* ¶¶ 32–33. Matt was "obviously drunk" during the drive to the Motel 6, and as soon as they arrived at the Motel 6, Matt exited the vehicle and was "very upset." *Id.* ¶¶ 34–36.

When Matt entered the Motel 6's lobby, he rudely demanded a room, grabbed a stack of cash, and threw it across the front desk counter. *Id.* ¶¶ 38–40. Matt made a fist and hit the counter, then sat down in the lobby. *Id.* ¶¶ 41–42. While Matt was seated in the lobby, the Motel 6 owner arrived and asked Matt to leave. *Id.* ¶¶ 43–44. Matt asked the Motel 6 owner if he could use the bathroom, but the owner denied his request. *Id.* ¶¶ 45–46. At some point, Matt picked up a plastic, yellow "wet floor" sign and threw it at a vending machine inside of the Motel 6. *Id.* ¶ 47. He

2

eventually exited the motel and urinated outside of the building. *Id.* ¶¶ 48–49. Matt returned to the lobby, and the owner informed him that police were en route to the motel. *Id.* ¶¶ 50–51. Matt sat down in the lobby to wait for the police and began to fall asleep. *Id.* ¶ 52.

At approximately 2:23 p.m., Officer Timothy Fuerst of the Green Bay Police Department was dispatched to respond to the Motel 6 call. *Id.* ¶ 53. When Officer Fuerst entered the motel, he saw Matt was seated in a chair in the hallway. *Id.* ¶¶ 58–59. Fuerst ask Matt what was going on but could not understand Matt's response. *Id.* ¶¶ 61–62.

Officer Lucy Elfman, a patrol officer for the Green Bay Police Department, also responded to the Motel 6 call. *Id.* ¶¶ 63–64. Upon her arrival, Officer Elfman observed that Matt was seated in the motel lobby, was excessively sweating, and appeared to be going in and out of consciousness. *Id.* ¶¶ 66, 68–69. Based on her training and experience, Officer Elfman believed Matt was under the influence of drugs or alcohol. *Id.* ¶ 70.

Officer Fuerst asked Matt to come outside to speak with the officers, and Matt agreed. *Id.* ¶¶ 71–72. When Matt stood up, Officer Fuerst placed him in handcuffs, and the officers walked him to the Motel 6's parking lot. *Id.* ¶¶ 73–74. Matt identified himself as "Aaron" to the officers, but he was later identified a Brian Matt. *Id.* ¶¶ 75–76. The officers noticed that Matt appeared to be going in and out of consciousness, had difficulty walking and responding to questions, and was sweating profusely and slurring his words. *Id.* ¶¶ 77–79. Based on his behavior, Officer Elfman requested medical rescue for an unknown medical issue. *Id.* ¶ 80. An ambulance arrived to assist Matt, and he was loaded into the ambulance and transported to St. Mary's hospital. *Id.* ¶¶ 81–82. Matt remained handcuffed inside of the ambulance, and Officer Fuerst rode in the ambulance with him, while Officer Elfman followed the ambulance in her squad car. *Id.* ¶¶ 83–85.

3

Upon arrival to the hospital, Matt was transferred from the ambulance cot to the hospital bed in Emergency Room #4. *Id.* ¶¶ 86–87. Officers Fuerst and Elfman remained in the room with Matt. *Id.* ¶ 88. The officers applied a pair of handcuffs to each of Matt's hands and secured them to the sides of the hospital bed. *Id.* ¶ 92. While in the hospital, Matt's legs were unrestrained. *Id.* ¶ 93. Officer Fuerst knew that Matt was unarmed. PPFOF ¶ 18. Officer Fuerst observed that Matt's eyes were glassy and bloodshot and that he emitted a distinct odor of alcohol. DPFOF ¶¶ 94–95. Blood tests during his stay at St. Mary's revealed Matt's Blood Alcohol Content (BAC) was 0.369. *Id.* ¶ 147.

As hospital staff attended to Matt, he drifted in and out of consciousness. PPFOF ¶ 19. At some point, Matt began to pull against the handcuffs attached to the sides of the hospital bed. DPFOF ¶ 96. He also attempted to sit up multiple times while restrained to the bed. *Id.* ¶ 97. Matt repeatedly called Officer Elfman and hospital staff "bitches" and yelled multiple profanities addressed to the officers and hospital staff in the room. *Id.* ¶¶ 98–99; Audio Recording, Dkt. No. 21. The officers issued verbal commands to Matt to stop his thrashing behavior, but Matt continued to thrash violently against the restraints. DPFOF ¶¶ 100–01. Due to his extensive thrashing, Officer Elfman requested that St. Mary's security deliver soft restraints to the room to protect Matt from hurting himself. *Id.* ¶¶ 102–03. While officers waited for hospital security, Matt kicked the hospital bed numerous times. *Id.* ¶ 104. In response to Matt kicking the bed, Officer Elfman crossed Matt's legs at his ankles and held them in place against the bed. *Id.* ¶ 105.

St. Mary's Security Officer Nancy Paul entered the room with soft restraints. *Id.* ¶ 106. Matt's left hand was removed from the handcuffs to be placed in soft restraints. *Id.* ¶ 107. When Matt's left hand was removed from the handcuffs, Officer Fuerst was standing on Matt's left side in order to hold the unrestrained left arm. *Id.* ¶ 108. While security staff attempted to place the

4

soft restraint, Matt made a noise in the back of his throat that sounded like he was collecting saliva. *Id.* ¶ 109; Audio Recording at 11:27. The officers believed that Matt was attempting to spit on them, so Officer Fuerst applied a pressure point to Matt's mandibular nerve in his jaw to stop him from spitting and Officer Elfman moved to the top of the hospital bed to control Matt's head. *Id.* ¶¶ 110–12. After Officer Elfman had control of Matt's head, Officer Fuerst returned to applying pressure on Matt's unrestrained left arm. *Id.* ¶ 113.

Matt contends that a spit hood was placed over his face incorrectly. Pl.'s Resp. to DPFOF ¶ 114, Dkt. No. 23; DPFOF ¶ 114. After the spit hood was applied, Officer Fuerst remained standing on Matt's left side and was angled in such a way that he was facing Matt's upper body and turned away from his lower body. DPFOF ¶¶ 115–16. Officer Fuerst applied pressure to Matt's left forearm in an attempt to secure the soft restraints. *Id.* ¶ 117. As hospital security staff attempted to apply the soft restraints, the first restraint broke. *Id.* ¶ 118. The second attempt to place a soft restraint on Matt's left arm took an extended amount of time. *Id.* ¶ 119. Officer Fuerst heard Officer Elfman say "something along the lines of 'Tim, watch out!'" *Id.* ¶ 120. Matt started kicking his legs, and his leg made contact with the left side of Officer Fuerst's head. *Id.* ¶¶ 121–22. Because Officer Fuerst was turned away from Matt's legs, Officer Fuerst did not see what part of Matt's leg hit his head. *Id.* ¶ 123. The impact jarred Officer Fuerst's head forward enough to knock his glasses off of his face and caused pain to his head and ear. *Id.* ¶¶ 124–25.

According to Defendants, Officer Fuerst recognized that he was being actively assaulted and believed Matt posed a threat of danger to himself, officers, and hospital staff in the room. *Id.* ¶¶ 126–27. Approximately one second after Matt kicked Officer Fuerst in the head, Officer Fuerst pushed Matt's leg away from his head and used his right hand in a closed fist to deliver one strong hand strike to Matt's face. *Id.* ¶¶ 128–29; PPFOF ¶ 22. A strong hand strike is a technique

5

designed to stop assaultive behavior. DPFOF ¶ 132. At the time of the hand strike, Matt's left arm and his legs were not restrained. *Id.* ¶¶ 133, 135. After the hand strike, Matt ceased his uncooperative behavior. *Id.* ¶ 138. Matt received two black eyes and a fractured, swollen nose as a result of being struck by Officer Fuerst. *Id.* ¶ 140; PPFOF ¶ 23. Matt could hear crunching in his face every time he moved his mouth, ate, or coughed. PPFOF ¶ 24.

Officer Fuerst notified his superior of the use of force. DPFOF ¶ 139. He had no injuries that required emergency medical care after being kicked in the head. *Id.* ¶ 141. Although Officer Fuerst denied medical attention to address his head, he had a headache and pain to his ear. *Id.* ¶¶ 142–43. After receiving medical attention, Matt was transported to the Brown County Jail. *Id.* ¶ 148. As a result of his conduct on January 5, 2021, Matt was charged with one count of Battery or Threat to a Judge, Prosecutor, or Law Enforcement Officer. *Id.* ¶ 149.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's

case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

Matt asserts that Officer Fuerst used excessive force in violation of the Fourth Amendment. Defendants assert that summary judgment should be granted on Matt's claim because Matt cannot meet his burden of showing that Officer Fuerst's use of force was unreasonable. "All claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. O'Connor*, 490 U.S. 386, 395 (1988). To succeed on a claim that an officer used excessive force against an arrestee in violation of his Fourth Amendment rights, "[a] plaintiff must show the officer's use of force was objectively excessive from the perspective of a reasonable officer on the scene under the totality of the circumstances." *Horton v. Pobjecky*, 883 F.3d 941, 949 (7th Cir. 2018). "Objective reasonableness of force is a legal determination rather than a pure question of fact for the jury to decide." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012) (citing *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003)). The inquiry required to assess an excessive force claim involves a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. This is a highly fact-intensive inquiry and "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citations omitted).

As the Court observed in *Graham*, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." 490 U.S. at 396. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033 (1973)). The calculus of reasonableness, in excessive force cases, "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. "This is true even when, as judged with the benefit of hindsight, the officers may have made 'some mistakes.'" *City & Cty. of San Fran. v. Sheehan*, 575 U.S. 600, 612 (2015) (quoting *Heien v. North Carolina*, 574 U.S. 54, 61 (2014)). Finally, "the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

Matt argues that Officer Fuerst's use of force was excessive and unreasonable because Officer Fuerst punched Matt out of anger and frustration. He maintains that he did not pose an immediate threat to the officers or others in the hospital room because he was incapacitated by alcohol, he was unarmed, he was restrained by handcuffs on one arm, there were two armed officers and a security guard present in the room, and his kick to Officer Fuerst's head was inadvertent. Matt contends that a plaintiff's level of intoxication should be considered as part of the excessive force analysis. *See Gupta v. Melloh*, 19 F.4th 990 (7th Cir. 2021) (finding that a dispute of fact existed as to whether plaintiff resisted arrest and explaining that, "[d]epending on which version of the story one credits, [the officer pulling plaintiff forward] was either an

8

appropriate and reasonable use of force to subdue an actively resisting suspect or was an unreasonable and excessive use of force against a passive, compliant, intoxicated suspect whom the police made vulnerable to injury by handcuffing his hands behind his back"). He asserts that, when considering his obvious intoxication and diminished capacity, he did not pose an immediate threat to the officers or others because he was incapacitated by alcohol, was unable to actually cause harm to himself or others, was not resisting, was incapable of running away, and was unable to understand commands.

"It is well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders. But that principle depends critically on the fact that the suspect is indeed subdued." *Johnson v. Scott*, 576 F.3d 658 (7th Cir. 2009) (internal citations omitted). Matt was clearly intoxicated with a BAC of 0.369, more than four times the legal limit. But he was not subdued or immobilized such that he posed no risk to himself or others. Matt yelled obscenities at the officers and staff in the hospital room, thrashed against the bed, and ultimately kicked Officer Fuerst in the face. *See Griggs v. Brewer*, 841 F.3d 308, 316 (5th Cir. 2016) ("Griggs was clearly *not* subdued and under restraint; if he were, he would not have been able to physically assault Officer Brewer. He still posed a danger to Brewer, as evidenced by the fact that he did, in fact, kick Officer Brewer in the chest."); *Billingsley v. City of Fort Wayne*, No. 17-cv-66, 2018 WL 6697075, at *7 (N.D. Ind. Dec. 20, 2018) ("Obviously, Billingsley still posed a threat to Officer Caudill or anyone who may have entered the room, as evidenced by Billingsley's kick at Officer Caudill."). Although Matt contends that he did not intentionally kick Officer Fuerst, the objective inquiry "turns on how a reasonable officer would have perceived the circumstances," not the suspect's intent. *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (citation omitted). Officer Fuerst reasonably believed that Matt posed a threat of harm to himself

9

and others in the hospital room, given that Matt was aggressive and noncompliant, was only restrained on his right arm, and kicked Officer Fuerst in the side of the head.

Matt asserts that Officer Fuerst used more force than was reasonably necessary. To the extent Matt argues that Officer Fuerst punched him because he was frustrated, Officer Fuerst's underlying intent or motivation is irrelevant to the objective reasonableness analysis. *Graham*, 490 U.S. at 397. Matt suggests that Officer Fuerst could have stepped back, continued to use pressure points, grabbed his arm or legs, used an open palm strike, or used a closed fist punch somewhere other than his nose or eyes. It is easy, in retrospect, to assert that Officer Fuerst should have used another maneuver. *Graham* makes clear, however, that the Fourth Amendment "does not require second-guessing if a reasonable officer making decisions under uncertainty and the press of time would have perceived a need to act." *Bell*, 321 F.3d at 640. The alternative measures the officers did use, such as applying pressure to Matt's limbs to stop his thrashing, applying a spit hood, and attempting to use pressure points, were unsuccessful in subduing Matt. After Officer Fuerst used the single forced hand strike, Matt stopped his uncooperative behavior. Based on the undisputed facts presented in this case, Officer Fuerst's single forced hand strike to Matt's face to subdue Matt and stop the threat Matt posed to the safety of the officers and the hospital staff was objectively reasonable. Summary judgment will therefore be granted in favor of Defendants.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (Dkt. No. 14) is **GRANTED**. This case is dismissed. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 8th day of April, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge